IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

TRACY BERNARD WILLIAMS                                              PLAINTIFF

                    v.                    Civil No.4:10-cv-04053

WARDEN TURNER, Miller
County Correctional Facility;
NURSE WILLIAMS; DR. NASH;
KIM VILLANCOURT; and
CORRECTIONAL HEALTH CARE
MANAGEMENT                                                         DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff, Tracy Bernard Williams (hereinafter Williams), an inmate of the Arkansas Department of Correction (ADC), filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.  This case is before me pursuant to the consent of the parties (ECF No. 20).

The events at issue in this case occurred while Williams was incarcerated at th Miller County Correctional Facility (MCCF).  Specifically, Williams maintains he was denied adequate medical care.

A bench trial was held on August 2, 2011.  The case is now ready for decision.

**I.  BACKGROUND**

On October 5, 2009, Williams was booked into in the MCCF.  *Defendants' Exhibit* 1 (hereinafter *Defts' Ex.*)  Williams remained incarcerated there for thirteen months before his transfer to the ADC.

The testimony of the following witnesses was taken:  (1) Dr. Jayendra D. Patel, by telephone on June 29, 2011, because of his unavailability for trial; (2) Tracy B. Williams, the Plaintiff; (3)

Harold Rigsby; (4) J.C. Collins; (5) Golden Adams; (6) Nadia Brown; (7) Major Gary Turner, a Named Defendant; (8); Eddie White; (9) Nurse Carmalita Williams, a named Defendant; and (10) Justin Murray.  For purposes of discussion, I will summarize the testimony of the witnesses.

**Dr. Jayendra D. Patel**

Dr. Patel testified that for approximately eight years he treated Williams for Chronic Myelogenous Leukemia (CML).  The condition is diagnosed through blood and bone marrow tests.  In Williams' case, he was first diagnosed at the Mayo Clinic in Minnesota.  The current treatment for CML is a tablet of Gleevec once a day and monitoring with a complete blood count on a regular basis.  *See Defts' Ex*. 2 at pg. 6.  Dr. Patel testified Williams had been on Gleevec for seven to eight years.

Gleevec inhibits or blocks the enzyme that triggers CML.  Gleevec is used to treat CML and to keep CML in remission.  Once the leukemia is in remission, the patient has to keep taking Gleevec for the rest of his life.  The current literature suggests no one for whom Gleevec works should stop taking it.

Dr. Patel testified Williams had been in complete molecular remission for a number of years and was in remission in 2009.  Dr. Patel testified this was the best response you could get from treatment.  Williams had no detectible leukemia.

According to Dr. Patel, it would be difficult to tell whether missing some doses of  Gleevec harmed Williams.  Dr. Patel testified you would not be able to tell in one patient the long term affect of missed doses.  Instead, he said a long term study would have to performed.  However, he testified the drug is absolutely crucial in the treatment of CML and it was not recommended that any doses be missed.  The standard dosage for adults is 400 mg.  Gleevec can be ordered from almost any drug store.

If a patient was off Gleevec, and had a positive reading on a blood test that would mean the disease had reactivated.  It is possible that the patient could take Gleevec again and go into remission.  However, if a re-institution of the Gleevec did not work, the patient might be forced to change to a different drug.  While Dr. Patel treated Williams, he was consistent in taking the medication.

On December 10th, Williams was brought to the clinic to see Dr. Patel.  However, Dr. Patel was not available.  *Defts' Ex.* 2 at pg. 7.  Williams told the nurse he was out of Gleevec and she had Dr. Engstrom write Williams a prescription for a thirty day supply of Gleevec.  *Id.*

Dr. Patel last treated Williams on December 31, 2009.  The CBC showed Williams' white blood count was within normal limits.  Dr. Patel testified there was nothing to suggest the CML was not still in remission.

Williams complained of night sweats and rectal bleeding.  *See Defts' Ex.* 2 at pg. 6.  Dr. Patel testified he first looked at Williams' lab work and made sure it was not the CML or medication causing it.  If the lab work eliminated those possibilities, Dr. Patel testified Williams would have to go to a gastroentologist or a family doctor for further diagnosis and treatment.  In fact, Dr. Patel recommended that Williams contact Dr. Mayo at the AHEC Clinic.  *Id.*  Williams was given a prescription for Gleevec and was told to return to the clinic in four months.  *Id.* at pg. 7.  Williams did not return.

**Tracy Williams**

When he was booked into the Miller County Correctional Facility (MCCF) on October 5, 2009, Williams testified he brought his medication to the jail with him.  Prior to his incarceration, Williams indicated he was taking medication on a daily basis.

He was taking medication for blood pressure, gout, and CML.  Williams indicated that Nurse

Williams came to booking and advised him that he would need to see "someone over her" before the medication could be administered.

Williams began receiving the Gleevec and other medications on October 7th. *Defts' Ex.* 1 at pg. 112. On November 22nd and December 2nd, Williams submitted grievances because he was not receiving his Gleevec. He indicates he submitted a number of grievances to Turner about this issue but did not get any responses. He also states he did not receive copies of his grievances.

According to Williams, Warden Turner would not approve his medication. Williams states that Nurse Williams told him that she could not order the medication without Warden Turner's approval.

On December 10th, Williams was taken to Dr. Patel's office and he was given a prescription for Gleevec. The transporting officer was Officer Rigsby. Williams handed the prescription to Officer Rigsby who turned it over to Nurse Williams when they got back to the jail. However, Williams testified the prescription was not filled until sometime in January.

In June of 2010, after he filed this lawsuit, Williams states he was called into Warden Turner's office. According to Williams, Turner apologized. At that time, Williams stated he was receiving the Gleevec.

The entire thirteen months he was in the MCCF, Williams testified he had problems receiving his Gleevec on a daily basis. Williams estimated that the longest period of time he was without the medication was fifty days. There were occasions where he went without Gleevec for weeks at a time.

He also maintained that his rectal bleeding was not treated properly. When the bleeding began, he thought it was associated in some way to his CML. Williams testified he had a colonoscopy and the bleeding was attributed to small external hemorrhoids. He received no

-4-

treatment for hemorrhoids at the Arkansas Department of Correction because the bleeding had stopped.  Williams indicates he suffers from anemia as a result of the CML and stays cold year round.

At times, Williams testified he refused his own medication.  When he was placed in super max, Williams stated he was fed "slop" that he couldn't eat.  Williams indicates he could not take Gleevec on an empty stomach and so refused it.  Williams estimated that over the period of his incarceration at the MCCF, he refused his medication thirty times.

**Officer Harold Rigsby**

In October of 2009, Officer Rigsby testified he was employed at the MCCF.  Inmates turned grievances into drop boxes located at various places in the detention center.  The grievances were then put into a compartment in the receiving area of the jail or in a box on the warden's door.  Medical request forms went directly to the medical staff.  If a grievance form is turned in dealing with medical issues, the sergeant determines how the grievance should be handled.

Once the grievance was responded to, it would be given back to the inmate.  Now the procedure is to make a copy of the grievances before they are returned to the inmates.

Officer Rigsby recalled Williams complaining that something was wrong with him and he was not getting his medication.  However, Officer Rigsby denied ever being shown any evidence of rectal bleeding.

On December 10th, Officer Rigsby testified he transported Williams to Dr. Patel's office.  Officer Rigsby indicated he was given paperwork to return to the nurse on duty.  Officer Rigsby did not read the paper and could not recall what nurse was on duty when he returned to the detention center.

-5-

**J.C. Collins**

Collins testified he was in the MCCF in October of 2009.  He was incarcerated in the same cell with Williams from December 2009 to May 2010.

During this time, Collins saw medication dispensed to Williams.  Collins recalled seeing evidence that Williams was bleeding rectally.  Specifically, twice during one month, Collins testified he saw blood on a tissue.

When an inmate wanted or needed medical care, Collins testified the procedure was for him to submit a sick call slip.  Collins stated that Nurse Williams did everything she could to help him.

**Officer Golden Adams**

Officer Adams testified she began working at the MCCF on November 28, 2009.  With respect to the grievance procedure, she indicated that prisoners complete a grievance form and then give the grievance to the officer on duty who takes the grievance and puts it in a box up front.  She indicated there were different boxes for grievances and sick call slips.  If the grievance is directed to the warden, Officer Adams testified she would put the grievance in the warden's box.  She was not sure who returned the grievances and stated she was not a grievance officer.

Officer Adams testified Williams never showed her any blood.

**Nurse Nadia Brown**

Nurse Brown testified she started working at the MCCF in July of 2010.  She recalled that one day Williams said he was hemorrhaging.  She did not see any blood.  At the time, she was distributing medication and did nothing in response to Williams' statement.

**Warden Gary Turner**

Warden Turner testified that he was the jail warden from November of 2009 until August of 2010.  Warden Turner recalled only having one conversation with Williams.  He indicated he called

Williams down to his office once because he was concerned about him. Warden Turner did not recall receiving any grievances from Williams regarding his medical care.   If he received a grievance regarding a medical issue, Warden Turner testified he would initial it and walk it down to the medical department.  Grievances regarding medical issues are put in the medical file.

Warden Turner also recalled speaking to Nurse Williams one time about Williams.  He could not recall when the conversation took place but he wanted to know if Williams was well enough to be in the general population.

According to Warden Turner, the medical staff make all arrangements for outside medical care for inmates.  Warden Turner indicated his approval was not needed for such appointments to be made.  In fact, he testified that he played no role in medical decisions.  However, he said if the medical staff wanted to talk to him they could.

Warden Turner testified Miller County contracts with Correctional Healthcare Management for the provision of medical staff and medical care and that he defers to them with respect to the provision of medical care. The medical staff is also responsible for obtaining and dispensing medication.  Warden Turner testified he had nothing to do with the use of an out of state pharmacy and that no one had discussed with him the cost of Williams' medication.

**Chaplin Eddie White**

Chaplin White testified he was employed by the MCCF from October to December of 2009. He was somewhat familiar with the grievance process.  He recognized the grievance form as being one used at the MCCF in 2009.  *Court's Exhibit* 1.

Inmates turned the grievance forms into the officers and the officers then put the forms in the supervisors box.  The officers did not sign the form in the space allotted for the receiving officer. Chaplin White testified he never took a grievance response back to an inmate.

-7-

Chaplin White recalled Williams bringing him two tissues each with a small amount of blood on them.  The blood was bright red and about the size of the bottom of a Styrofoam cup.

### Nurse Carmalita Williams

Nurse Williams testified she began working at the MCCF in July of 2009 and was employed there until February of 2011.  On January 1, 2010, Nurse Williams became the Health Services Administrator.  Prior to that, she was an evening shift nurse.  In that capacity, her primary duties were attending to emergencies and dispensing medication.

When an inmate was booked in with medication, the booking officer would call the nurse on duty.  On October 5th, she was called by the booking officer while she was dispensing medication.  She looked at the medication Williams brought with him and explained that she had to go through the doctor to get his medications.   The medication Williams brought with him was placed in his property.  At the time, she was not aware of the purpose of Gleevec but Williams explained why he was taking it and that his treating doctor was Dr. Patel.

Nurse Williams testified that Dr. Nash usually evaluated inmates unless an emergency situation was involved.  After the evaluation by Dr. Nash, she sent the paper work to the corporate office to get the medication approved.

Nurse Williams testified Williams began receiving his medication on October 7th.  *Defts' Ex.* 1 at pg. 112.  At the MCCF, Nurse Williams testified that medical staff distributed all medication.   The medication is dispensed until the prescription runs out.   A medication administration record is kept and the nurse who distributes the medication initials the record.  Her initials are CW and if the initials are circled on the administration record it indicates the drug was not dispensed either because no medication was available or because the inmate refused the medication. *See e.g., Defts' Ex.* 1 at pg. 112.  However, the policy was to note on the back of the log

-8-

whether it was a refusal indicated by a #1 or whether the medication was out of stock indicated by a #6. *See e.g., Defts' Ex.* 1 at pg. 134. Clearly, this was not done with any regularity as there are many pages of the log that have circles on the front but contain no explanation on the back. *See e.g., Defts' Ex.* 1 at pg. 112.

The Gleevec was prescribed for ninety days. *See e.g, Defts' Ex.* 1 at pg. 116. The record shows the start date as 10/7/09 and the discontinue date as 1/5/2010. If the medication is to be administered after this date, the doctor has to continue it.

Williams brought two bottles of pills with him. However, the number of pills in each bottle is not disclosed. On November 25, 2009, Nurse Williams wrote on a problem oriented record, which she indicated is a pass along report, that Dr. Patel needed to be contacted regarding Williams' Gleevec prescription because Williams was running out of medication. *Defts' Ex.* 1 at pg. 61. Nurse Williams testified it would have been the Health Services Administrator at the time, Cheryl Walsh's responsibility to make arrangements with Dr. Patel's office.

According to the medication administration records, Williams did not receive Gleevec on November 29th or from December 14th to December 31st. At this time, Nurse Williams testified the Gleevec Williams had brought to the MCCF was gone. Nurse Williams understood that Gleevec was to be given on a daily basis. However, she states there was no prescription for it in Williams' file.

Nurse Williams indicated there is no record of who made the arrangements for Williams to be taken to Dr. Patel on December 10th. Nurse Williams testified she did not know that Williams had received a written prescription for Gleevec that day and Williams' medical file did not contain a December 10th prescription. Typically, when an inmate's prescription ran out, Nurse Williams testified she would contact Dr. Stringfellow, the MCCF's physician at the time.

If a prescription was written for medication they did not have on hand, before the medication ran out, Nurse Williams testified they contacted the physician to get the prescription approved and then sent the order to the corporate office.  The corporate office is located in Colorado and they use Diamond Pharmacy Services in Indiana, Pennsylvania.  If Diamond Pharmacy does not have the medication, Hyde Pharmacy is contacted.

In Williams' case, the written prescription for Gleevec was obtained on December 31st. *Defts' Ex.* 1 at pg. 76.  The medication was ordered and Diamond Pharmacy only had fifteen tablets to dispense. *Id.* at pg. 98.  On January 26th, Diamond Pharmacy sent another thirty tablets. *Id.* at pg. 99.  Beginning on January 12th, Gleevec was dispensed to Williams. *Id.* at pg. 119.  While the administration record appears to indicate Williams received Gleevec on January 2nd and 3rd, initialed by Nurse Stewart, Nurse Williams testified they did not have Gleevec on those dates so it could not have been dispensed.  No Gleevec was dispensed on January 26th.  Williams received Gleevec each day in February and March. *Defts' Ex.* 1 at pgs. 121-125.  In April, there are four days circled indicating he refused the medication and two days on which the record is blank. *Id.* at pg. 126.

With respect to the alleged blood loss, in November of 2009, Williams had three stool guaiac tests positive for blood in the stool. *Defts' Ex.* 1 at pg. 64.  In February, blood tests were done that came back normal--no significant blood loss.  Nevertheless, Williams testified that Dr. Nash made the decision that a colonoscopy should be arranged. *Id.* at pg. 73.

In April of 2010 the doctor ordered labs because of the positive quiac.  However, Williams refused the tests. *Defts' Ex.* 1 at pg. 37.  On April 29, 2010, a colonoscopy was performed. *Defts' Ex.* 1 at pg. 18.  It was normal except for the presence of small internal hemorrhoids. *Id.*

Nurse Williams testified she was present on October 1, 2010, when Williams refused to allow

blood to be drawn for testing.  *Defts' Ex.* 1 at pg. 7.  Nurse Brown initially tried to draw blood from his left arm but was unsuccessful.  She was going to attempt to draw blood from his right arm but Williams refused.

### Officer Justin Murray

Officer Murray testified he has been employed as a detention officer by the MCCF since April 12, 2010.  Detention officers do not pass out medication.

The forms contained in *Court's Exhibit* 1 are the grievance forms used at the MCCF.  He testified the grievances are put into a box and the sergeants go through the grievances and take care of it.  He has never signed in the space for the signature for the receiving officer.  He indicated inmates generally put the name of the officer who the grievance is directed to in that line.  The grievances are responded to and given back to the inmates.

Officer Murray recalled Williams showing him a piece of tissue with a little blood on it.

## II.  DISCUSSION

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833, 851(1998)(citation omitted). "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth Amendment."  *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007).  In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care.  *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [she] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). "For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 498 (8th Cir. 2008).

Williams' claims center on two aspects of his medical care. First, he maintains it was important that he take Gleevec on a daily basis and there were significant periods of time when it was not available to him. Second, he maintains Defendants unreasonably delayed in performing tests to determine the cause of his rectal bleeding.

It has been held that an occasional missed dose of medication, without more, does not constitute a violation of the Eighth Amendment. *See Zentmyer v. Kendall County, II.*, 220 F.3d 805, 811 (7th Cir. 2000)(missed five out of thirty antibiotic pills prescribed over a period of eleven days; twenty six applications of Otocort out of eighty prescribed over a period of twenty days; and one dose of two other medications prescribed over a six day period). In this case, it is clear that because of the procedures used, including requiring corporate approval and then utilizing an out of state pharmacy, the Gleevec was not always available to Williams on a daily basis. Certainly, the medical staff could have been more diligent in ensuring there was a continuous supply of Gleevec available at the facility. However, even when the Gleevec was available, Williams himself refused it on at

-12-

least thirty separate occasions.  This suggests Williams was not concerned that refusing doses of the medication would adversely impact his health.  In fact, while Williams missed doses of Gleevec on multiple occasions either because of the unavailability of the medication or because of his refusal to take it, all evidence shows that the CML stayed in remission and Williams testified to no other health consequences he suffered as a result of the misses doses.  Under the peculiar circumstances of this case, I find no deliberate indifference on the part of any of the Defendants to Williams' serious medical needs in connection with the distribution of his medication.

With respect to Williams' complaints of rectal bleeding, he was seen by Dr. Patel on December 31, 2009, who referred him to AHEC Clinic.  He was seen by Dr. Nash on March 13th and prescribed fiber and stool softener.  He was referred to the Texarkana Gastroenterology Consultants, P.A., and underwent a colonoscopy on April 29, 2010.  As noted above, the colonoscopy was normal except for the presence of small internal hemorrhoids.

The objective seriousness of a delay in the provision of medical care must be measured by reference to the effect of delay which must be shown by verifying medical evidence.  *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005).  There is no evidence in this case that Plaintiff was adversely affected by the delay in treatment.

### III.  CONCLUSION

For the reasons stated, judgment will be entered in Defendants' favor.

DATED this 6th day of October 2011.

/s/ *J. Marschewski*

 HON. JAMES R. MARSCHEWSKI
 CHIEF UNITED STATES MAGISTRATE JUDGE